```
         IN THE UNITED STATES DISTRICT COURT FOR THE

                    DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,     )
                              )
          Plaintiff,          )         2:06CR2487
                              )
     v.                       )
                              )
RUBEN MADRID-VEGA,            )         MEMORANDUM AND ORDER
                              )
          Defendant.          )
_____)
```

This matter is before the Court after an evidentiary hearing was held on February 22, 2007, on defendant's motion to suppress evidence (Filing No. 13), defendant's motion to exclude testimony (Filing No. 14), and the government's motion seeking an order authorizing agents to obtain fingerprints from the defendant (Filing No. 19).  The Court denied defendant's motion to exclude testimony at the hearing and allowed the testimony of Border Patrol Agent Joel Nickles at the hearing.

## I.  Facts

On July 1, 2006, defendant Ruben Madrid-Vega ("defendant" or "Madrid-Vega") was riding in a Chevrolet pickup truck heading north on Interstate 25 near Truth or Consequences, New Mexico, at approximately 9:20 a.m. when the vehicle was observed by Senior Border Patrol Agent Joel Nickles ("Nickles") who was acting as a roving border patrol.  Nickles observed that the two-seat pickup truck contained four adult males.  According to Nickles, the truck was driving at or near the 75 mile per hour

speed limit in heavy holiday traffic when it attracted his attention because the four occupants looked rigid and frozen as they drove past him and did not appear to look at him or the scenery. On this basis, and his eighteen years of experience as a border patrol officer, Nickles proceeded to follow the pickup. Because of the heavy traffic, it took him a while before he was able to merge into the traffic and follow the pickup.

      Eventually, Nickles caught up to the pickup and approached closely enough to obtain the license plate number, which he radioed in to determine whether the vehicle was properly licensed and whether or not it had been reported stolen. The pickup truck had a New Mexico license plate, and Nickles was informed that the pickup truck was registered to Vicente Ramirez of Taos, New Mexico, and was not reported stolen.[1] Nickles also inquired as to whether or not the pickup had crossed the southern border within the past 72 hours and found out that the pickup had not crossed the border within the previous 72 hours.

      Not only did Nickles follow the pickup, but he also pulled alongside of it in an attempt to see into the bed, looking for evidence of other hidden passengers. Nickles could not see any such evidence. He also noted that the vehicle did not appear to be heavily loaded. Finally, when asked to describe the

---

[1] Taos, New Mexico, is located in northern New Mexico and is most efficiently reached from southern New Mexico by driving north on Interstate 25.

occupants' appearance, Nickles was unable to give any physical description beyond that they were males who were sitting rigidly.

Just before the pickup truck reached a point 100 air-miles north of the border, Nickles used the flashing lights on the top of his vehicle to signal the pickup truck to pull over. The driver of the pickup truck promptly complied.

As he walked up to the driver's side window, Nickles noted that the truck bed was empty. At the evidentiary hearing, Nickles opined that in his opinion, based on what he knew, if the driver had elected to refuse to speak to him and had driven off, he would not have possessed the reasonable suspicion necessary to justify continuing to follow the vehicle and stopping it again. Nevertheless, Nickles proceeded to approach the driver, asked the driver his name and for his driver's license and identification. The driver, Vicente Ramirez, produced his driver's license and his resident alien card which identified him as a legal resident of Taos, New Mexico, and the person to whom the pickup was registered. At no time did Nickles give a Miranda warning to the driver or to any of the passengers.

Nickles then asked the other passengers if they had documents entitling them to legally be present in the United States. All three passengers, including the defendant, admitted they did not possess any such documents and that they were not legally in the United States. Nickles then called for backup,

proceeded to arrest all four men, and transported them in his vehicle to the Truth or Consequences border patrol station.  At the station, all four men were questioned by other officers and fingerprinted.  Based on his fingerprints, the defendant was identified as having been previously deported and having a drug conviction in Oklahoma.  Defendant was subsequently charged with reentry of a removed alien who, prior to his removal, was convicted of an aggravated felony.

On December 26, 2006, defendant filed his motion seeking to suppress all evidence obtained following the July 1, 2006, vehicle stop (Filing No. 13) on the basis that the stop was not supported by the requisite reasonable suspicion.  On January 11, 2007, the United States filed a motion seeking to compel the defendant to provide finger print exemplars (Filing No. 19).  An evidentiary hearing on both motions was held on February 22, 2007.  After the hearing, both parties were given the opportunity to file supplemental briefs on the issue of whether or not the defendant possessed standing under the Fourth Amendment to challenge the stop of the vehicle.

## II.  Analysis

**A.   Standing**

The United States first asserts that the defendant lacks the requisite standing to challenge the stop under the Fourth Amendment because only the driver, not the passengers, has

-4-

standing to challenge the stop of the vehicle.  The Supreme Court has recognized that questions of "standing" to challenge a search and seizure are "more properly subsumed under substantive Fourth Amendment doctrine."  *Rakas v. Illinois*, 439 U.S. 128, 139 (1978).  The proper inquiry is whether a challenged stop and search violated the Fourth Amendment rights of a criminal defendant making the challenge.  *Rakas,* 439 U.S. at 140.

Drivers and passengers have similar interests in seeing that their persons remain free from unreasonable seizure.  *United States v. Erwin*, 875 F.2d 268, 270 (10th Cir. 1989).  The Tenth Circuit Court of Appeals has held that a passenger has sufficient Fourth Amendment interests to challenge a traffic stop of a vehicle.  *Id.*  The Court finds that the defendant has standing to challenge the July 1, 2006, vehicle stop under the Fourth Amendment.

**B.   Defendant's Motion to Suppress Evidence**

Defendant's motion seeks to suppress all evidence obtained as a result of the stop of the pickup truck in which he was riding and his subsequent arrest on July 1, 2006.  Defendant asserts that the stop violated 8 U.S.C. § 1357(a)(3) and the Fourth Amendment.  The issue before the Court is whether Agent Nickles' stop was justified by a reasonable suspicion that he would find illegal aliens, which was his articulated reason for initially stopping the vehicle in which the defendant was riding.

*See United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001) (noting that the first step in evaluating the constitutionality of an investigative detention is determining whether the stop was "'justified at its inception'")(*quoting Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

Beyond the border and its functional equivalent, the fundamental protections of the Fourth Amendment are implicated, and law enforcement may make an investigatory stop only if an officer has reasonable suspicion that "criminal activity may be afoot." *United States v. Quintana-Garcia,* 343 F.3d 1266, 1270 (10th Cir. 2003); *United States v. Monsisvais,* 907 F.2d 987, 989-90 (10th Cir. 1990); *see also, Brignoni-Ponce,* 422 U.S. 873, 884 (1975). If the stop becomes more than a mere investigatory stop or a search ensues, there must be probable cause. *United States v. Watson,* 423 U.S. 411 417- 24 (1976). While the border patrol is subject to regulations that set a 100 air mile limit, a stop made more than 100 air miles from the border is not a violation of a person's Fourth Amendment rights, so long as the reasonable suspicion requirement is met. *United States v. Leyba*, 627 F.2d 1059, 1065 (10th Cir. 1980)(dictum).

An officer's "reasonable suspicion" must be based on the totality of circumstances. *Brignoni-Ponce,* 422 U.S. at 885 n.10. Although the Court may not make one factor determinative in a "totality of circumstances" analysis, the Court may assign

-6-

different weights to individual factors. *See United States v. Little,* 60 F.3d 708, 712 (10th Cir. 1995); *United States v. Venzor-Castillo,* 991 F.2d 634, 638-39 (10th Cir. 1993). The greater the distance from the border, the more distance from the border may weigh against a finding of "reasonable suspicion" when the Court engages in a "totality of circumstances" analysis. *Venzor-Castillo*, 991 F.2d at 639. Specifically, the *Venzor-Castillo* court stated that "the more attenuated the international border becomes, the greater the significance distance assumes in the equation used to measure the power to stop only on reasonable suspicion when the officer has no knowledge whatever about the point of origin of a particular traveler's route." *Id.*

The Supreme Court has emphasized that, in determining whether an investigatory stop is supported by reasonable suspicion, courts must "'look at the totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The evaluation is made from the perspective of the reasonable officer, not the reasonable person. Officers must be permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id*. (*quoting United States v. Cortez*, 449 U.S. 411, 418 (1981)).

In determining whether a stop in a border area is supported by reasonable suspicion, the following factors, known as the *Brignoni-Ponce* factors, are relevant:

> (1) characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*Gandara-Salinas*, 327 F.3d at 1129-30 (*quoting United States v. Monsisvais*, 907 F.2d 987, 990 (10th Cir. 1990)(*citing Brignoni-Ponce*, 422 U.S. at 884-85)).  When evaluating these factors, a court must not engage in the kind of "divide-and-conquer analysis" rejected by the Supreme Court. *Gandara-Salinas*, 327 F.3d at 1130.  That is, a court must not separate out each factor and reject the officer's determination of reasonable suspicion simply because each factor, standing alone, might be "readily susceptible of an innocent explanation." *Gandara-Salinas*, 327 F.3d at 1130.  A proper examination of the totality of the circumstances must recognize that "individual factors that may appear innocent in isolation may constitute suspicious behavior when aggregated together."  *United States v.*

*Diaz-Juarez*, 299 F.3d 1138, 1141 (9th Cir. 2002)(*citing United States v. Sokolow*, 490 U.S. 1, 9-10 (1989)).

A consideration of all of the *Brignoni-Ponce* factors reveals:

> (1) characteristics of the area in which the vehicle is encountered;

Here the vehicle was stopped north of Truth or Consequences, New Mexico, heading north on Interstate 25, a major interstate that is heavily traveled and which leads toward the driver's residence in Taos, New Mexico.

> (2) the proximity of the area to the border;

The stop occurred approximately 125 road-miles north of the border and approximately 98 air-miles from the border as authorized in 8 U.S.C. § 1357(a)(3).

> (3) the usual patterns of traffic on the particular road;

Interstate 25 is a heavily traveled interstate highway which runs north from Interstate 10 at Las Cruces, New Mexico, and continues for over 1,000 miles until it terminates in Buffalo, Wyoming, at Interstate 90. This stop occurred on the Fourth of July weekend, a particularly busy time for interstate travel.

> (4) the previous experience of the agent with alien traffic;

Agent Nickles has eighteen years experience as a border patrol officer, all of it stationed at the Truth or Consequences station. This station is responsible for 50-300 illegal alien detections per month.

> (5) information about recent illegal border crossings in the area;

There was no particular recent illegal border crossings which were publicized so as to result in a particularly heightened state of alert.

> (6) the driver's behavior, including any obvious attempts to evade officers;

Agent Nickles stated that no attempts were made to evade the officer. He also did not notice any changes in speed or direction. The driver was said to be staring straight ahead and did not appear to be conversing with the other passengers.

> (7) aspects of the vehicle, such as a station wagon with concealed compartments;

The vehicle was a two-seat pickup truck with four adult male passengers. The vehicle was licensed in New Mexico and registered to the driver, a resident alien who lived in Taos, New Mexico.

> (8) the appearance that the vehicle is heavily loaded.

Agent Nickles observed no indications that the truck was heavily loaded and no indications of any "hidden" passengers.

In *United States v. Garcia*, the court noted an additional factor to be considered is whether or not the officer had made any attempt to determine if the vehicle originated south of the border.  *United States v. Garcia,* 732 F.2d 1221, 1223 (5th Cir. 1984).  "[A] vital element of the *Brignoni-Ponce* test is whether the agent had 'reason to believe that the vehicle [in question] had come from the border.'"  *Garcia,* 732 F.2d at 1223 (*quoting United States v. Lamas,* 608 F.2d 547, 549 (5th Cir. 1979)(citations omitted)).  Agent Nickles did a 72-hour check on the vehicle which came back negative, indicating that the vehicle had not crossed the border at a border crossing in the past 72 hours.

The Court's analysis of the totality of the factors suggests that the officer did not have a reasonable articulable suspicion to justify a warrantless stop 125 road-miles (and nearly 100 air-miles) from the border between the United States and Mexico.  Agent Nickles' own testimony makes clear that the only factor that justified the stop was his observation that the vehicle contained four adult males who were sitting rigidly.  Though he observed the occupants "sitting rigidly," he was unable to identify any other identifying characteristics of any of the occupants such as their racial identity, their complexions or any other distinguishing features.  All of the other *Brignoni-Ponce* factors, when applied to this vehicle would apply equally to all

In *United States v. Garcia*, the court noted an additional factor to be considered is whether or not the officer had made any attempt to determine if the vehicle originated south of the border.  *United States v. Garcia,* 732 F.2d 1221, 1223 (5th Cir. 1984).  "[A] vital element of the *Brignoni-Ponce* test is whether the agent had 'reason to believe that the vehicle [in question] had come from the border.'"  *Garcia,* 732 F.2d at 1223 (*quoting United States v. Lamas,* 608 F.2d 547, 549 (5th Cir. 1979)(citations omitted)).  Agent Nickles did a 72-hour check on the vehicle which came back negative, indicating that the vehicle had not crossed the border at a border crossing in the past 72 hours.

The Court's analysis of the totality of the factors suggests that the officer did not have a reasonable articulable suspicion to justify a warrantless stop 125 road-miles (and nearly 100 air-miles) from the border between the United States and Mexico.  Agent Nickles' own testimony makes clear that the only factor that justified the stop was his observation that the vehicle contained four adult males who were sitting rigidly.  Though he observed the occupants "sitting rigidly," he was unable to identify any other identifying characteristics of any of the occupants such as their racial identity, their complexions or any other distinguishing features.  All of the other *Brignoni-Ponce* factors, when applied to this vehicle would apply equally to all

other vehicles on the road that day.  The stop violates the defendant's Fourth Amendment rights.  Therefore the Court will grant defendant's motion to suppress all evidence obtained as a result of the stop of the pickup truck in which he was riding and his arrest on July 1, 2006 (Filing No. 13).

**C.   Order Authorizing Agents to Obtain Fingerprints**

Finally, the government seeks an order authorizing agents to obtain the defendant's fingerprints (Filing No. 19). This same issue was addressed in *United States v. Juarez-Torres*, 441 F. Supp. 2d 1108 (D. N.M. 2006) by Chief Judge Martha Vazquez.

As in *Juarez-Torres*, the government argues that its request for fingerprint exemplars does not offend the Fourth Amendment and makes the broad assertion that "[a]n individual does not enjoy a constitutionally protected privacy interest in his fingerprints."  (Govt's Mot. for Fingerprint Exemplars, p. 2).  In support of its assertion that the Fourth Amendment is not implicated, the government cites three Supreme Court cases, none of which support the government's argument.

First, in *Cupp v. Murphy,* 412 U.S. 291 (1973), the Court recognized that a defendant's fingerprints may come under the purview of Fourth Amendment protection, but found that the Fourth Amendment was not violated in that case because there was probable cause to believe that the respondent had committed

murder.  The Court specifically stated that "[t]he vice of the detention in *Davis* [where defendant was arrested without probable cause] is therefore absent in the case before us."  *Cupp,* 412 U.S. at 295 (referring to *Davis v. Mississippi,* 394 U.S. 721 (1969)).  Clearly, *Cupp* is distinguishable from the present case because of the presence of probable cause in *Cupp.*

The government also cites *United States v. Dionisio,* 410 U.S. 1 (1973).  In *Dionisio,* the Court held that the defendant could be compelled to provide voice exemplars before a grand jury (fingerprint evidence was raised by analogy).  In so holding, it stated that the compelled production of the voice exemplars would not violate the Fifth Amendment.  *Id.* at 12.  However, the Court recognized that the Fourth Amendment might be implicated if the initial restraint of a defendant infringed on his Fourth Amendment rights.  *Id.* at 8.

Finally, the government cites *Schmerber v. California,* 384 U.S. 757 (1966), to support its argument.  In *Schmerber,* the issue was admissibility of blood taken over the defendant's objection (fingerprint evidence was raised by analogy in this case).  In examining the admissibility of such evidence, the Court stated that "if compulsory administration of a blood test does not implicate the Fifth Amendment, it plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment."  *Id.* at 767.

Contrary to the government's argument, each of the above referenced cases support the assertion that fingerprint evidence may implicate Fourth Amendment protections and do not support the government's assertion that "[a]n individual does not enjoy a constitutionally protected privacy interest in his fingerprints."

Defendant has been detained since the time of the arrest, over eight months ago.  The government now seeks to exploit this detention that resulted from the unlawful arrest by gathering evidence that it otherwise would not have obtained.  However, if the government is allowed through fingerprint exemplars to accomplish what it is precluded from doing because of its violation of defendant's constitutional rights, the force of the exclusionary rule will effectively be gutted.

## CONCLUSION

When Border Patrol Agent Nickles stopped the vehicle that defendant was traveling in, Agent Nickles lacked reasonable suspicion that criminal activity was afoot.  Therefore, the stop and seizure violated defendant's constitutional rights.  To remedy this violation, the Court finds that it is appropriate to suppress all evidence obtained as a result of this unlawful stop, including evidence of identity, fingerprints, statements, purported immigration file and all observations of the defendant's presence in the United States.  Moreover, the Court

finds that the government may not benefit from the illegality of the stop by now obtaining fingerprint exemplars from the defendant.  Accordingly,

    IT IS ORDERED

    1)  That defendant's motion to suppress (Filing No. 13) is granted; and

    2) That the United States' motion to obtain fingerprints (Filing No. 19) is denied.

    DATED this 6th day of March, 2007.

    BY THE COURT:

    /s/ Lyle E. Strom
    _____
    LYLE E. STROM, Senior Judge
    United States District Court